UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | ) | |
| 351 California Street, Suite 600 | ) | |
| San Francisco, CA 94104 | ) | |
| | ) | |
| Plaintiff, | ) | Case No: _____ |
| | ) | |
| v. | ) | |
| | ) | COMPLAINT FOR |
| KEN SALAZAR, Secretary | ) | DECLARATORY AND |
| U.S. Department of the Interior | ) | INJUNCTIVE RELIEF |
| 1849 C Street NW | ) | |
| Washington, DC 20240 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAN ASHE, Director | ) | |
| U.S. Fish and Wildlife Service | ) | |
| 1849 C Street NW | ) | |
| Washington, DC 20240 | ) | |
| | ) | |
| Defendants. | ) | |

INTRODUCTION

1.     This case under the Administrative Procedure Act, 5 U.S.C. §§ 551-706 ("APA")

seeks to compel Defendants to conclude  a formal rulemaking – initiated by Defendant U.S. Fish

and Wildlife Service ("FWS" or "Service") nearly six years ago – to amend a federal regulation

promulgated in 1998 under the Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA" or

"Act") that governs FWS's reintroduction program for the Mexican gray wolf ("Mexican wolf").

The rulemaking was commenced in direct response to a petition submitted to the Service by

Plaintiff Center for Biological Diversity ("Center") over eight-and-a-half years ago.

2.     One of the rarest land mammals in the world and the most genetically-distinct

subspecies of gray wolf in North America, the Mexican wolf has already been exterminated from

the wild once.  Having been "reintroduced" to the American Southwest, the Mexican wolf again

balances precipitously on the brink of extinction, with only 58 animals currently surviving in the

wild.  With such a small population, the Mexican wolf shows signs of reduced genetic diversity

that further threatens its survival.  This sad state of affairs is due in large part to capture,

relocation, illegal killings or poaching, and even killing of wolves by Defendant U.S. Fish and

Wildlife Service ("FWS") or at that agency's behest.  These activities separate wolves from their

family packs and disturb the wolves' social relationships and pack structure.

3.      In light of the extremely-imperiled status of the Mexican gray wolf, population

numbers that are far below the minimum necessary for survival, and the need for reforms to the

species' reintroduction program that FWS scientists long ago determined to be necessary for the

wolf to survive and begin to recover, the Center submitted a formal petition for rulemaking to

FWS on March 29, 2004 ("Petition").  Among other needed reforms, the Center's Petition

formally requested, pursuant to the APA, amendment of the Mexican wolf "10(j) regulation"

(also "10(j) rule"): (1) to provide FWS the authority to release Mexican wolves from a captive

breeding program to a large area, known as the "secondary" recovery zone, encompassing much

of the Gila National Forest in New Mexico; (2) to provide FWS the authority to allow wolves to

establish territories outside the boundaries of the Blue Range Wolf Recovery Area; and (3) to

define "nuisance wolves" and "problem wolves" to exclude wolves that scavenge on the

carcasses of livestock that die of non-wolf-related causes.  These basic amendments are

indisputably necessary to allow the Mexican wolf to survive the very real threat of extinction.

4.      When FWS failed to respond to the Center's Petition for over 36 months, the

Center brought a lawsuit under the APA in 2006, in this Court, to compel a response.  *Ctr. for

Biological Diversity v. Kempthorne*, Civ. No. 06-02119 (D.D.C.) (RCL).  In response to this

litigation and the Center's Petition, FWS initiated a formal rulemaking in February 2007 to

"modify the 10(j) rule to establish a nonessential, experimental population of the Mexican Gray

Wolf," and as a result the Center's lawsuit was dismissed as moot.  Yet, FWS never substantially

proceeded with, let alone concluded, the rulemaking.  Hence, the Center brings this lawsuit to

compel FWS – at long last – to conclude the rulemaking that the agency started long ago in

response to Plaintiff's petition.

5.      FWS's failure to conclude the rulemaking it initiated almost six years ago to

amend the 10(j) regulation for the Mexican wolf constitutes agency action that is "unreasonably

delayed" in violation of the APA, 5 U.S.C. § 706(1).  Having waited over eight-and-a-half years

since it formally petitioned FWS to carry out this rulemaking, the Center is entitled to a final

rulemaking decision under 5 U.S.C. § 555(b).

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  Venue

is proper in this district pursuant to 28 U.S.C. § 1391(e).

## PARTIES

7.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit organization

dedicated to the conservation of rare and imperiled animals and plants and the habitats on which

they depend.  The Center is incorporated in California and maintains its headquarters in Tucson,

Arizona, and additional offices in New Mexico, Arizona, California, Nevada, Oregon,

Washington, Alaska, Minnesota, Vermont, Florida, and Washington, D.C.  The Center works

through science, law, and creative media to secure a future for all species, great or small,

hovering on the brink of extinction.  The Center has almost 39,000 members.

8.      The interests of the Center and its members are impaired by FWS's delay in completing the rulemaking it initiated almost six years ago in response to the Center's petition. Because FWS has refused to complete its rulemaking to modify the regulation governing the Mexican wolf's reintroduction under section 10(j) of the ESA, the Mexican wolf experimental population has remained at very low numbers – far below the level necessary to survive – and lost precious genetic diversity.  As a result, the Center's members' ability to observe and study members of the Mexican wolf population in the wild is diminished, and could be extinguished. Hence, their aesthetic, scientific, recreational, and other interests in this species have been, and continue to be, impaired.  In addition, because of the agency's delay in concluding this rulemaking, the Center must continue to expend resources advocating for improved management of Mexican wolves, when such resources could be spent on other conservation projects.  If FWS were to complete its rulemaking and modify the 10(j) regulation in any or all of the respects requested by the Center in 2004, the experimental wolf population would be more likely to succeed in the wild and increase in numbers, and there would be more Mexican wolves for the Center's members to observe and study.  The Mexican wolf's habitat in the Blue Range Wolf Recovery Area, which includes America's and the world's first protected wilderness area, would function more naturally through a resurgence of Mexican wolves in the wild, thus enhancing the enjoyment, understanding, and appreciation of this ecosystem by the Center's members who live and visit there.  Even if FWS were to conclude the rulemaking without making the changes to the 10(j) regulation that the Center has requested, at least the Center would then have an opportunity to seek judicial review of the agency's final rulemaking decision, and could potentially obtain additional protections and conservation measures for Mexican wolves.

9.      Defendant KEN SALAZAR is the Secretary of the U.S. Department of the Interior, and is the official ultimately responsible for implementing the ESA with regard to terrestrial species.  Secretary Salazar is sued in his official capacity.

10.      Defendant DAN ASHE is the Director of the U.S. Fish and Wildlife Service, which is the federal agency that has been delegated responsibility for implementing the ESA with regard to terrestrial species.  Director Ashe is sued in his official capacity.

### STATUTORY FRAMEWORK AND FACTS GIVING RISE TO PLAINTIFF'S CLAIM FOR RELIEF

A.      RELEVANT STATUTORY AND REGULATORY SCHEME

(1)      The Endangered Species Act

11.      Recognizing that all fish, wildlife, and plant species are "the Nation's heritage," Congress enacted the ESA with the purpose of providing both a "means whereby the ecosystems upon which endangered and threatened species may be conserved" and a "program for the conservation of such endangered species."  16 U.S.C. § 1531(a)(5), (b).  To achieve these purposes, the ESA directs all "Federal agencies" to "utilize their authorities in furtherance of the purposes of this [Act] by carrying out programs for the conservation of endangered and threatened species."  *Id*. § 1536(a)(1).  The Act further requires FWS, through its delegated authority, "develop and implement plans … for the conservation and survival of endangered species and threatened species."  *Id*. § 1533(f).

12.      The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered or threatened species to the point at which the measures provided pursuant to this [Act] are no longer necessary," *i.e.*, delisting, or recovery of the species. *Id*. § 1532(3).

13.     For species of wildlife listed as endangered, section 9 of the ESA makes it unlawful for any person to "take any such species within the United States." *Id*. § 1538(a)(1)(B). The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19).  Under section 4, FWS may promulgate special regulations that extend the take prohibition to species listed as "threatened" under the Act, or otherwise provide for the conservation of threatened species. *Id*. § 1533(d).

14.     Section 10(j) of the ESA authorizes the Secretary of the Interior to "authorize the release … of any population … of an endangered species or threatened species outside the current range of such species." *Id*. § 1539(j)(2)(A).

15.     Before designating a species as experimental and authorizing its reintroduction, FWS must make three findings: (1) that the reintroduction will "further the conservation" of the species; (2) whether the population is "essential to the continued existence" of the species; and (3) that the "population is wholly separate geographically from nonexperimental populations of the same species." *Id*. § 1539(j)(1), (2)(A), (2)(B).

(2)     The Administrative Procedure Act

16.     The Administrative Procedure Act, 5 U.S.C. §§ 551-706, obligates all federal agencies to give "an interested person the right to petition for the issuance, amendment, or repeal of a rule" and to "conclude a matter" presented to them "within a reasonable time." *Id*. § 555(b), (e).

17.     When an agency undertakes a formal rulemaking process under the APA, it must publish "[g]eneral notice" of the proposed rulemaking in the Federal Register and "give interested persons an opportunity to participate" in the rulemaking through submission of written

comments.  *Id.* § 555(b).  Following notice and an opportunity for written comment, the agency

must consider relevant matters presented to it and incorporate in a rule a "concise and general

statement of their basis and purpose."  *Id.* § 555(c).  A final, substantive rule must be published

30 days before it takes effect.  *Id.* § 555(d).

B.      FACTUAL BACKGROUND

        (1)      Mexican Gray Wolf and Its Decline

        18.      The Mexican wolf, or "lobo," is the smallest subspecies of the gray wolf in North

America, typically weighing approximately 50 to 90 pounds and reaching 26 to 32 inches in

height.  Mexican wolves live in family packs, and prey primarily on hoofed mammals, or

ungulates, such as deer and elk.  Historically, the Mexican wolf lived in forest and desert regions

of the Republic of Mexico and southern New Mexico, Arizona, and Texas.

        19.      When livestock replaced wild ungulates on the Western landscape in the late

nineteenth and early twentieth centuries, wolves preyed largely on livestock.  In response, states,

counties, and stock associations offered bounties on wolf scalps.  In 1915, the U.S. Bureau of

Biological Survey ("Biological Survey") initiated a more efficient program of salaried federal

hunters who systematically trapped wolves, poisoned them, and dug up pups from their dens.  As

a result, resident breeding populations of wolves, including the Mexican wolf, disappeared from

the western United States by the late 1920s.  In 1945, FWS (formerly the Biological Survey)

killed what was likely the last resident wolf in the western United States, in southern Colorado.

In 1950, FWS persuaded the Mexican government to allow U.S. Government-salaried wolf

hunters to initiate the systematic poisoning of wolves throughout Mexico.  FWS also continued

to attempt to kill every Mexican wolf that entered the United States until the 1970s, when no

more Mexican wolves were known to arrive.

7

20.    In 1996, FWS identified the Mexican wolf as "one of the rarest land mammals in the world."  REINTRODUCTION OF THE MEXICAN WOLF WITHIN ITS HISTORIC RANGE IN THE SOUTHWESTERN UNITED STATES, FINAL ENVIRONMENTAL IMPACT STATEMENT (November 1996) ("EIS") at iv.

(2)    Mexican Wolf Recovery Efforts

21.    Policies toward Mexican wolves changed with the passage of the ESA in 1973 and FWS's listing of the Mexican wolf as an endangered species on April 28, 1976.  From 1977 to 1980, five wolves, comprised of four males and a single female, were captured alive in Mexico for an emergency captive breeding program.

22.    In 1982, FWS and the Director of the Mexican wildlife agency jointly adopted a Recovery Plan for the Mexican wolf to bring it back to its historic range.  1982 Mexican Wolf Recovery Plan ("Recovery Plan").  The "prime objective" of the 1982 Recovery Plan was to maintain a captive breeding program and to re-establish a "viable, self-sustaining population of at least 100 Mexican wolves in the middle to high elevations of a 5,000-square mile area within the Mexican wolf's historic range."  *Id*. at 28.  The Recovery Plan directed FWS to protect Mexican wolves from being killed in predator control and fur-trapping efforts, conduct research concerning the ecology and behavior of Mexican wolves, propagate Mexican wolves in captivity, and release wolves into Mexico and/or adjoining areas in the Southwest.  *Id*. at 30-32.

23.    FWS did not take steps to implement the Recovery Plan's direction to reintroduce captive Mexican wolves until over a decade later, and then only as a result of a lawsuit filed by conservation organizations in 1990.  In 1993, in a stipulation dismissing the lawsuit, FWS finally agreed to implement the Recovery Plan and "accomplish the reintroduction of the Mexican Wolf into the wild" as "expeditiously as possible."

(3)     The Mexican Wolf 10(j) Rule

24.     On January 12, 1998 – over 20 years after FWS first listed the Mexican wolf as

endangered – FWS finally promulgated a regulation pursuant to section 10(j) of the ESA

authorizing the first reintroduction of Mexican wolves into eastern Arizona and southwestern

New Mexico.  *Endangered and Threatened Wildlife and Plants; Establishment of a Nonessential*

*Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico*, 63 Fed. Reg.

1752 (Jan. 12, 1998).  By this point, the only known Mexican wolves lived in captivity, as part of

the breeding program implemented by non-profit organizations – *i.e.*, the species had become

completely extirpated in the wild.  EIS at 1-1.  The 10(j) rule classified Mexican wolves to be

reestablished in designated areas of Arizona and New Mexico as an "experimental" population

that was "non-essential" to the continued survival of the species."  50 C.F.R. § 17.84(k)(1).  In

the rule, FWS found that wolf reintroduction would "further the conservation of the Mexican

wolf subspecies and of the gray wolf species," *id*. § 17.84(k)(2), and that the experimental

population was "wholly separate geographically" from any other wild gray wolf population or

individual gray wolves.  *Id.*

25.     The 10(j) rule authorizes FWS to release captive Mexican wolves into the

"primary recovery zone" in the Blue Range Wolf Recovery Area, consisting of about 2,664 km$^2$

of the Apache National Forest in Arizona.  *Id*. § 17.84(k)(15).  Although the rule does not permit

FWS to release any captive wolves into the "secondary recovery zone" – consisting of the

remainder of the Apache National Forest and the Gila National Forest in New Mexico – the rule

authorizes FWS to translocate, or re-release, wolves into this area if the wolves needed to be

relocated for predator control or other reasons.  *Id*.  The rule also allows wolves released into the

primary recovery zone to expand naturally into the secondary recovery zone.  *Id*. §

17.84(k)(9)(I).  Under the rule, FWS planned to release up to 15 family groups of captive

Mexican wolves over five years, with the objective of "re-establish[ing] 100 wild Mexican

wolves … by the year 2005."  EIS at 1-1.

26.     The 10(j) rule authorizes private landowners to "take" a wolf (including both by

injuring and by killing) when a wolf is found on private land "engaged in the act of killing,

wounding, or biting livestock," 50 C.F.R. § 17.84(k)(3)(v), and requires that, on public land,

livestock owners obtain a permit to take wolves engaged in such activities.  *Id*. §

17.84(k)(3)(vii).  The rule also authorizes individuals to "harass or take" a Mexican wolf in self

defense or in defense of the lives of others, with the restriction only that an individual notify

FWS of the harassment or take within 24 hours of its occurrence.  *Id*. § 17.84(k)(3)(xii).

27.     Under the 10(j) rule, if a member of the experimental population is found outside

of the designated recovery area, but inside the experimental area, FWS must either capture and

re-release the wolf within the recovery area, return the wolf to captivity, or otherwise manage the

wolf according to provisions of a FWS-approved management plan.  *Id*. § 17.84(k)(9)(iii).

However, the rule presumes that any wolves found completely outside of the experimental area

are of wild origin, and affords them all of the protections of an endangered species.  *Id*.

28.     The 10(j) rule committed FWS to "evaluate Mexican wolf reintroduction progress

and prepare periodic progress reports, detailed annual reports, and full evaluations after three and

five years that recommend continuation, modification, or termination of the reintroduction

effort."  *Id*. § 17.84(k)(13).

(4)     The Paquet Report

29.     In March 1998, FWS released 11 wolves into the Blue Range Wolf Recovery

Area, and, by March 2001, had released an additional 45 captive wolves.  As required by the

10(j) rule, FWS then initiated a three-year review of the progress of the project, enlisting Dr.

Paul C. Paquet, a scientist and one of the world's leading experts on wolves, to assemble a team

of experts and make recommendations as to whether to continue, modify, or terminate the

project.

30.     Dr. Paquet and his colleagues completed their scientific report in June 2001.

Based on a review of all of the existing monitoring data, Dr. Paquet's team recommended that

FWS continue the Mexican wolf reintroduction project, but make certain modifications to the

10(j) rule.  Paul C. Paquet, *et al*., MEXICAN WOLF RECOVERY: THREE-YEAR PROGRAM REVIEW

AND ASSESSMENT (June 2001) ("Paquet Report" or "Three-Year Review").

31.     First, the Paquet Report recommended that FWS "[i]mmediately" modify the

10(j) rule to provide FWS the authority to conduct initial releases of captive Mexican wolves

into the Gila National Forest – the "secondary" recovery zone.  Paquet Report at 65.  According

to the Paquet Report, wolves had already settled much of the primary recovery zone, and "[o]ver

time, it will become harder for the Service to find suitable release sites in the primary recovery

zone." *Id*.  The Paquet Report explained that the Gila National Forest includes "about 700,000

acres that are roadless and free of livestock" and "[s]everal high-quality release sites," and that

this is "by far the most important an simplest change the Service can make to the existing

reintroduction project." *Id*.  Accordingly, the Paquet Report "strongly recommend[ed] that the

Service immediately take whatever action is necessary to conduct initial release of captive-born

(and wild-born if appropriate) Mexican wolves to the Gila National Forest." *Id*.

32.     Second, the Paquet Report recommended that FWS "[i]mmediately" modify the

10(j) rule to allow wolves that are not "management problems" to establish territories outside of

the Recovery Area. *Id*.  The Paquet Report explained that retrieving animals that wander outside

of the Recovery Area is "inappropriate" because it is "inconsistent with the Service's approach to recover wolves in the southeast, Great Lakes states, and the northern Rockies;" will lead to "serious logistical and credibility problems as the wolf population grows and more wolves disperse from the area;" and "needlessly" excludes habitat that could "substantially contribute to the recovery" of Mexican wolves." *Id*. at 65-66.  The Paquet Report further noted that, in "sharp contrast" to FWS's efforts to recover gray wolves in other parts of North America, FWS had devised a rule for Mexican wolf reintroduction that "requires wolves to be removed from public and private land outside the Blue Range Wolf Recovery Area, even in the absence of a problem," and that "[s]uch regulations are inappropriate … ." *Id*. at 66.  In addition, the Report explained that frequent recaptures and re-releases of wolves may "interfer[e] with pack formation and establishment and maintenance of home ranges," and that wolf dispersal outside of the recovery area "is to be expected and required if the regional population is to be viable." *Id*. at 23.

33.     Third, the Paquet Report concluded that FWS should "require" that livestock owners on public land take responsibility for the removal and disposal of dead livestock carcasses, to reduce the likelihood that Mexican wolves will become habituated to feeding on livestock.  *Id*. at 63.  In this regard, the Report express the concern that wolves may scavenge on livestock carcasses left by ranchers on national forest lands, and become "predispose[d] to eventually prey on livestock."  *Id*.  The Paquet Report further explained that "[w]hile some predation on livestock is inevitable, reasonable means of reducing the frequency of occurrence will enhance wolf recovery so that it is respectful of the needs and concerns of livestock producers," and consequently, "livestock producers using public land in occupied Mexican wolf range should be required to exercise reasonable diligence in finding livestock that have died to either dispose of the carcass or enable the Service to do so."  *Id*. at 67-68.

12

(5)     The Center's Petition for Rulemaking Under the APA

34.     When almost three years had passed and FWS had not taken any steps to implement the recommendations of the Paquet Report, on March 29, 2004 the Center petitioned FWS to amend the 10(j) regulation.   The Center's Petition was precipitated by evidence that indicated that the experimental population was in decline.  Specifically, according to the Center's petition, the number of radio-collared and monitored Mexican wolves in the wild had dropped from 27 – when the Paquet Report was released in June 2001 – to only 18 wolves in 2003. Petition for Rulemaking (March 29, 2004) ("Petition") at 11.  The Petition also reiterated the Paquet Report's concern that wolf "survival and recruitment rates … are far too low to ensure population growth and persistence" and, thus, without "dramatic improvement in these vital rates, the wolf population will fall short of predictions for upcoming years."  Petition at 10; Paquet Report at 27.

35.     Consistent with the Paquet Report, the Center's Petition cited "frequent government control actions" – *e.g.*, capturing and re-releasing, or killing, of wolves that had wandered outside of the designated recovery area – as cause for the "uncertain prognosis for recovery" of Mexican wolves.  Petition at 11.  According to the Petition, such control actions "directly resulted in the deaths of ten wolves (nine accidental and one purposefully) and in the destruction of numerous packs and the resultant loss in (additional) individual animals' lives and in many possibilities for success in reproduction."  *Id.*  Even when wolves were re-released elsewhere, the Petition explained, the wolves' chances for survival "diminish significantly because family packs break up and their individual members then travel vast distances alone … ."  *Id.* at 11-12.

36.     To remedy these deficiencies, and consistent with the Paquet Report, the Center's

Petition sought modification of the 10(j) regulations that would: (1) provide FWS the authority to

release captive Mexican wolves into the "secondary" recovery zone, the Gila National Forest in

New Mexico; (2) provide FWS the authority to allow wolves to establish territories outside the

boundaries of the Blue Range Wolf Recovery Area; and (3) define "nuisance wolves" and

"problem wolves" to exclude animals that scavenge on the carcasses of livestock that die of non-

wolf causes.  Petition at 3.  The Petition contended that each of the proposed amendments was

clearly warranted by the Paquet Report's recommendations to FWS.  *Id.*

37.     By failing to act on the findings of the Paquet Report, and to promulgate

amendments to the 10(j) rule, the Center concluded that FWS was jeopardizing the recovery of

the Mexican wolf, and violating section 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1), which

requires all federal agencies to utilize their authorities to recover endangered and threatened

species.  *Id.*

(6)     Five-Year Review

38.      In 2003, FWS delegated responsibility for overseeing the reintroduction project

to the Mexican Wolf Blue Range Adaptive Management Oversight Committee ("AMOC").

AMOC is comprised of representatives of FWS, the Arizona Game and Fish Department, the

New Mexico Department of Game and Fish, the U.S. Forest Service, the United States

Department of Agriculture's Wildlife Services (part of the U.S.D.A.'s Animal and Plant Health

Inspection Service), and the White Mountain Apache Tribe.  AMOC's responsibilities included

conducting a "full evaluation" of the reintroduction project after five years, as required by the

10(j) rule.

39.     On December 31, 2005, AMOC submitted to FWS its final report and recommended that FWS continue the reintroduction project with modifications to the 10(j) rule. Mexican Wolf Blue Range Reintroduction Project (Dec. 31, 2005) ("Five-Year Review").  As requested by the Center in its Petition, AMOC recommended that FWS amend the 10(j) rule to allow wolves to disperse outside of the recovery area.  AMOC also recommended that FWS combine the "primary" and the "secondary" zones of the designated Recovery Area, and release and relocate wolves throughout this combined area, to provide additional opportunities for the wolf population to grow.

40.     On July 25, 2006, FWS announced that it agreed with AMOC's recommendations.  *See* Press Release, U.S. Fish and Wildlife Service, *Mexican Wolf Project to Continue* (July 25, 2006).  However, at that time FWS did not issue any amendments to the 10(j) rule or indicate when it would propose or adopt a new rule.

(7)     Prior Litigation

41.     More than two-and-a-half years after the Center submitted its Petition to FWS pursuant to the APA's rulemaking procedures without any substantive response, the Center filed a lawsuit in this Court in December 2006, challenging the agency's failure to respond to the Center's Petition as "unreasonable delay" under section 706(1) of the APA.  *Ctr. for Biological Diversity v. Kempthorne*, Civ. No. 06-02119 (D.D.C.) (RCL).

42.     In response to the Center's litigation, by letter dated February 8, 2007, FWS stated that "[i]n response to your petition and pursuant to the findings of the 5-year review" the agency had "started the process to modify the 10(j) rule" and would "formally consider modifications requiring formal rule changes, including expansion of recovery area boundaries … ."  FWS stated that the rulemaking process "could take up to 3 years to complete … ."  *Id*. at 2.

15

FWS also committed to initiate a process, pursuant to the National Environmental Policy Act ("NEPA"), in connection with the rulemaking, stating that it had paid $126,000 to the Arizona Game and Fish Department and the New Mexico Department of Game and Fish to initiate a scoping period for preparation of an environmental impact statement for the rulemaking, and that it was actively looking for additional funds for the NEPA process. *Id.*

43.     On the basis of the statements made in its February 8, 2007 letter to the Center, FWS moved to dismiss the Center's prior lawsuit as moot. *Ctr. for Biological Diversity v. Kempthorne*, Civ. No. 06-02119 (D.D.C.) (RCL), Dkt. 7.

44.     Finding that the February 8, 2007 letter constituted the requested "response" to the Center's Petition, on August 6, 2007 the Court dismissed the Center's lawsuit on mootness grounds.  Dkt. 26.  However, in an opinion dated the same date, the Court stated that its holding "does not prevent plaintiff from filing a new claim alleging unreasonable delay if defendants do not complete the rule-making process to modify the 10(j) rule within a reasonable period of time."  Dkt. 27 at 8.

45.     In the nearly six years since FWS stated that it initiated a formal rulemaking process to modify the 10(j) rule, the agency has never completed this rulemaking.  Indeed, although in late 2007 the agency conducted an initial public scoping period under NEPA and held public meetings and offered a public comment opportunity, FWS has never published a proposed rule or promulgated a final amendment to the 10(j) regulation.

        (8)     The 2010 Mexican Wolf Conservation Assessment

46.     In 2010, FWS released another analysis of the Mexican wolf's status.  U.S. Fish and Wildlife Service, MEXICAN WOLF CONSERVATION ASSESSMENT (2010) ("Conservation Assessment").  The Conservation Assessment described the Mexican wolf population as "not

thriving" due to "management and regulatory mechanisms, such as regulations associated with the internal and external boundaries" of the recovery areas as well as inbreeding. *Id*. at 78. The assessment found that "the cumulative effect of these threats results in a consistently high level of mortality, removal, and reduced fitness" that, when combined with other factors, "threatens the population with failure." *Id*. at 14. Moreover, the assessment noted that the longer these threats persist, the greater the challenges for recovery, particularly for "genetic fitness" and long-term adaptive potential of the population." *Id*. at 78.

(9)     The Mexican Wolf's Precarious Status

47.     Since the Center petitioned FWS over eight-and-a-half years ago, the Mexican wolf experimental population – the subspecies' only chance for recovery – has been hanging on to survival at very low numbers. FWS's annual census data for the population shows that there were only 58 wolves at the end of 2011. Meanwhile, FWS projected at the start of the reintroduction project that the experimental population would grow to 102 wolves by the end of 2006. One hundred Mexican wolves is the bare minimum population number that FWS determined in the 1982 Recovery Plan is necessary to get the species back on the road to recovery. However, the reality is that, to date, this minimal objective for the Mexican wolf population remains unattained.

48.     Mexican wolves have remained at very low numbers – and far below the minimum population number of 100 – due to capture and relocation, illegal killings or poaching, and killing of wolves by FWS or other agencies. Since reintroduction began in 1998, 12 wolves have been shot by FWS or Wildlife Services, 18 additional wolves have died as a consequence of capture efforts, and 35 wolves have been removed and placed in captivity (and never re-released). Many (perhaps the majority) of these "management actions" would not have been

17

necessary with amendments of the 10(j) rule with the reforms called for by the Center's Petition and FWS scientists, which would minimize conflicts by allowing for release of captive wolves into the secondary recovery zone, allowing wolves to establish territories outside of the recovery area, and reducing the likelihood that Mexican wolves will become habituated to feeding on livestock by requiring on livestock owners on public land to remove and dispose of dead livestock carcasses.

49.     The failure of the population to grow has occurred with a continued reduction in the Mexican wolf's genetic diversity (stemming from an already depauperate gene pool in the captive Mexican wolf population), which may undermine future possibilities for recovery.

50.     Despite the continued decline of the experimental population and the reduction in genetic diversity, the recommendations of the Paquet Report, FWS's agreement with AMOC's recommendations in the Five-Year Report, the Center's Petition, FWS's initiation of a rulemaking process to modify the 10(j) regulation in 2007, and a Conservation Assessment in 2010 reconfirming the Mexican wolf's dire status, FWS has yet to complete the rulemaking that it began nearly six years ago.  FWS has never published a proposed amendment to the 10(j) regulation, promulgated a final amendment, or otherwise taken any steps to comply with the rulemaking procedures of the APA and conclude this much-need rulemaking.

PLAINTIFF'S CLAIM FOR RELIF
Violation of Sections 555(b) and 706(1) of the Administrative Procedure Act: Unreasonable Delay in Concluding the Formal Rulemaking to Amend the Mexican Wolf 10(j) Regulation

51.     Plaintiff hereby incorporates all preceding paragraphs.

52.     By failing to conclude the formal rulemaking that it started nearly six years in response to the Center's March 29, 2004 Petition to amend the 10(j) regulation for Mexican wolves, when Defendants' own Three- and Five-Year Reviews recommend modifications and,

during the agency's continued delay, the Mexican wolf has precipitously declined far below the

level the agency itself has defined as minimally necessary to begin to recover the species,

Defendants have "unreasonably delayed" agency action in violation of sections 555(b) and

706(1) of the APA.

53.     Defendants' delay has injured and continues to injure Plaintiff in the manner

described in paragraphs 7-8.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

(1)     Declare that Defendants have violated sections 555(b) and 706(1) of the

Administrative Procedure Act by unreasonably delaying conclusion of the rule-making process

to amend the Mexican wolf 10(j) rule;

(2)     Order Defendants undertake and conclude the rule-making process to amend the

10(j) rule by dates certain that are enforceable by the Court;

(3)     Grant such other relief and further relief as the Court may deem just and proper.


DATED:          November 28, 2012                  Respectfully submitted,


_____
Amy R. Atwood, DC Bar No. 470258
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Tel: (503) 283-5474
Fax: (503) 283-5528
atwood@biologicaldiversity.org

_____
Katherine A. Meyer, DC Bar No. 244301
MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Avenue NW, Suite 700
Washington, D.C. 20009
Tel: (202) 588-5206
Fax: (202) 588-5049
kmeyer@meyerglitz.com

*Attorneys for Plaintiff*